**Ernest J. HENDRY, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

**No. 490, Docket 32306.**

United States Court of Appeals Second Circuit.

Argued June 6, 1969.

Decided Nov. 12, 1969.

John R. Harold, Frank J. Barbaro, New York City, for plaintiff-appellant.

Michael C. Silberberg, Michael D. Hess, Asst. U. S. Attys., Robert M. Morgenthau, U. S. Atty., for defendant-appellee.

Before WATERMAN, FRIENDLY and KAUFMAN, Circuit Judges.

WATERMAN, Circuit Judge:

Appellant was licensed in 1943 by the U.S. Coast Guard pursuant to authority contained in 46 U.S.C. § 224 as qualified "to sail as Master of a steam vessel of any gross tonnage upon the oceans of the world,"[1] and until 1962 served on Merchant Marine vessels as a deck or watch officer. In March 1962 he complained to the Coast Guard that while serving on an oil tanker he had been assaulted and threatened by the captain of the vessel. A Coast Guard investigation ensued and the investigation report concluded that these accusations were unfounded. The report reached the same conclusions about an earlier similar complaint by the appellant. According to the report, various interviewed crew members felt Hendry was "always complaining" and was "under the illusion that everyone was against him." They also said that "some of his actions appear[ed] to be bizarre." The Philadelphia office of Hendry's union declined to participate in the investigation but did state that Hendry "had a history of registering complaints." The recommendation of the investigation report was that, although appellant was apparently a well qualified officer, he possibly might be unfit for duty because of his apparent inability to get along with his shipmates.

Upon the request of the Senior Investigating Officer, appellant voluntarily agreed to deposit his license with the Coast Guard "until such time as I am declared fit for sea duty by the U.S. Public Health Service." He further agreed that "pending my certification as fit for sea duty, I will not accept employment on any merchant vessel of the United States."

Pursuant to the applicable federal regulations appellant underwent a psychiatric examination at a United States Public Health Hospital on Staten Island on April 5. The initial report of the examining psychiatrist, Dr. Ramirez, stated:

> This is the case of a man 42 years, married, working in the Merchant Marine. This man is in a special situation because he had a trouble with his boss. They had an intense and violent disagreement. His intelligence is normal. Ideas are well coordinated. Reasonable. Emotional normal. Connation normal. Sleep O.K. Diagnostic-normality? Normality apparently in his family.

At the trial Dr. Ramirez testified that the question mark after "Diagnostic-normality?" reflected doubts in his mind about this conclusion, but inasmuch as he had little to go on, he declared the appellant "fit."

The day following this examination Dr. Ramirez received a copy of the Coast Guard report on the appellant and certain letters written by Hendry to the Coast Guard. After seeing these items Dr. Ramirez recommended a further examination, using psychological tests, and appellant was examined by a clinical psy-

---

1. The quoted language is that of the complaint.

chologist at the hospital. Dr. Feuerburgh, the examining clinical psychologist, sent a report to Dr. Ramirez which stated that psychological tests revealed a personality

"with a latent paranoid thinking disorder * * * from the record this is a man who has difficulty in getting along with people * * * we have evidence of a pattern of responses consistent with a paranoid schizophrenic condition * * * (he) does not show the ego defenses to be able to be regarded as now suitable for active duty * * * he should be encouraged to seek psychotherapy."

Upon considering Dr. Feurerburgh's report and the Coast Guard report Dr. Ramirez reviewed his own examination of appellant and this time concluded that appellant was not fit for sea duty and that his case should be reevaluated in six months.

Appellant objected to this conclusion, enlisted the aid of union representatives, and underwent a psychiatric examination by a private psychiatrist. This psychiatrist arrived at a different conclusion about Hendry's "fitness" from that reached by Dr. Ramirez. Thereafter appellant procured a Coast Guard reexamination by the Chief of the Psychiatric Service, Dr. Paul Smith. Dr. Smith's findings, filed on July 6, 1962, were as follows:

"After a complete review of the available documents and the information of all sorts already available in our clinical record, it is my opinion that an appropriate diagnostic label for this man would be a paranoid personality. He shows the sensitivity, the suspiciousness, the stubbornness and the tendency to utilize the mechanism of projection, characteristic of

such a personality type. I do not believe however, that his psychological state is disabling at this time nor does it seem likely to become so in the foreseeable future. He is accordingly fit for duty at sea psychiatrically."

As a result of this reexamination report the Coast Guard restored appellant's license to him and he was pronounced fit for sea duty.

The within action was then instituted. Appellant seeks $50,000 in alleged damages caused by the claimed negligence and malpractice of the agents of the United States, Doctors Ramirez and Feuerburgh, professional employees of the U. S. Public Health Service.[2] Jurisdiction was based on the Federal Tort Claims Act, Title 28 U.S.C. § 1346(b), § 2671 et seq. Hendry claimed that negligent psychiatric examinations by the doctors caused him to lose wages for the period of three and one half months that elapsed during the suspension of his license. He also claimed that, as a result of these negligent examinations, he suffered mental and physical hardship and anguish and was damaged in his reputation.

After the filing of an extensive pretrial order the case was tried in the United States District Court for the Southern District of New York by Judge Pollack sitting without a jury; and after the evidence had been concluded he dismissed the cause for lack of subject matter jurisdiction and, alternatively, gave judgment to the defendant United States on the merits. His opinion is reported at 280 F.Supp. 27 (SDNY 1968). In dismissing the action for lack of jurisdiction the court below relied upon the so-called "discretionary function" exception set forth in the Tort

2. The doctors were originally individually joined as codefendants with the United States but after the denial by Judge Murphy of the United States District Court for the Southern District of New York of a government motion to dismiss appellant's complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief could be granted, the action against the doctors was dismissed upon stipulation, leaving the Government the sole defendant when the case was tried.

Claims Act, 28 U.S.C. § 2680(a) which reads as follows:

§ *2680 Exceptions.*

The provisions of this chapter and section 1346(b) of this title shall not apply to—

(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

In reviewing the decision below we turn first to appellant's claim for lost wages. The district court held that Hendry's claim for wages, to be actionable, must allege a tort recognized by New York law, which applies to federal tort claims by virtue of 28 U.S.C. § 1346(b). The court found that the only New York tort which Hendry's complaint might invoke is that of interference with contractual relations. However, not only did Hendry fail to allege malice as required in such suits, Campbell v. Gates, 236 N.Y. 457, 141 N.E. 914 (1923), but Section 2680(h) of Title 28 expressly bars "any claim arising out of * * * interference with contract rights." Dupree v. United States, 264 F.2d 140 (3 Cir.), rehearing denied, 266 F.2d 373 (3 Cir.), cert. denied, 361 U.S. 823, 80 S.Ct. 69, 4 L.Ed.2d 67 (1959).

Beginning with Judge Cardozo's well-known opinion in Glanzer v. Shepard, 233 N.Y. 236, 135 N.E. 275, 23 A.L.R. 1425 (1922), New York has been a leader in imposing liability for negligent misrepresentation. In International Products Co. v. Erie R. R., 244 N.Y. 331, 155 N.E. 662, 56 A.L.R. 1377 (1927), the Court of Appeals held that a shipper who justifiably relies on a carrier's false report on the location of the shipper's goods can recover for resulting losses if the carrier was negligent. See Restatement Second of Torts § 552 (Tent.Draft No. 10, 1964). In so deciding the court drew support from a holding that a physician is liable for failure to exercise due care when he is "hired by another, examines a patient, and states the result of his diagnosis." 244 N.Y. at 336, 155 N.E. at 663. For this proposition, the court cited Harriott v. Plimpton, 166 Mass. 585, 44 N.E. 992 (1896), which held:

[T]he fact that the purpose of the [doctor's] examination [at the behest of the plaintiff's employer] was information, and not medical treatment, is immaterial; and the breaking of plaintiff's marriage engagement, in consequence of the wrong diagnosis [of a venereal disease], was not too remote a damage to sustain the action. Upon the evidence, it was for the jury to say whether [the doctor] used ordinary care, learning, and diligence.

In light of this it appears to us that if Hendry had been negligently examined and reported on by private physicians he could sustain a claim for lost wages under New York law.

We prefer not to strain to analogize Hendry's allegations to the rather different facts which normally give rise to private actions for interference with contract rights. We are not convinced that the "contract rights" exception to the Federal Tort Claims Act would be meaningless if it were not applied to cases such as this. There may be situations where, for example, an official of the United States maliciously entices away the employees or the customers of a plaintiff, and such activity would be more closely akin to the private torts of interference with contractual relations than was the Public Health Service action here. Hence we do not find Hendry's claim for loss wages to be barred by the statute.

Appellant's claim for compensation for mental anguish caused by suspension of his license also states a cause of action under New York law, which

permits recovery of damages for emotional and mental upset suffered by reason of proved negligence even though there is no proof of a corresponding physical symptom. See Ferrara v. Galluchio, 5 N.Y.2d 16, 176 N.Y.S.2d 996, 152 N.E.2d 249, 71 A.L.R.2d 331 (1958). The Government alleges, however, and the trial court held, that the decision to revoke appellant's license falls within the "discretionary function" exemption of 28 U.S.C. § 2680(a), quoted above. In examining this defense we note that the administrative decision to revoke the license and the medical decision that appellant was a paranoid schizophrenic and thus unfit for sea duty were for all practical purposes one and the same decision. The medical examination by the Public Health Service had no purpose other than to enable the Coast Guard to make a determination on licensing. Conversely, on the facts of this case it seems clear that the determination of whether the appellant should be licensed as fit for sea duty depended entirely on the outcome of the medical examination.[3] The fact that two governmental agencies were involved should not obscure the fact that here the medical judgment effectually constituted the licensing judgment as well.

■ The controlling question then is whether this hybrid medical-administrative decision involved the kind of discretion which § 2680(a) seeks to protect. Various licensing determinations have in the past been held discretionary rather than operational within the meaning of § 2680(a), and therefore to be exempt from suit. Several cases, for example, have held the assignment of grazing permits under the Taylor Grazing Act to be matters of discretion. See United States v. Morrell, 331 F.2d 498 (10 Cir.), cert. denied, sub nom. Chournos v. United States, 379 U.S. 879, 85 S.Ct. 146, 13 L.Ed.2d 86 (1964); Powell v. United States, 233 F.2d 851 (10 Cir.

1956); Chournos v. United States, 193 F.2d 321 (10 Cir.), cert. denied, 343 U.S. 977, 72 S.Ct. 1074, 96 L.Ed. 1369 (1952). Similarly, the power of the Commandant of the Coast Guard to forbid merchant marine employment to an individual "unless the Commandant is satisfied that the character and habits of life of such person are such as to authorize the belief that the presence of the individual on board would not be inimical to the security of the United States" has been held discretionary. Dupree v. United States, 247 F.2d 819, 822 (3 Cir. 1957). And in Coastwise Packet Co. v. United States, 398 F.2d 77, 79 (1 Cir.), cert. denied, 393 U.S. 937, 89 S.Ct. 300, 21 L.Ed.2d 274 (1968), the court found discretion in the Coast Guard's decision not to license a ship as seaworthy, stating that:

> Plaintiff's is not a case where there was a single, known, objective standard which, because of administrative negligence, the Coast Guard failed to apply. In such an area there might be questions. When no standard exists, then the process of certifying, insofar as it involves groping for a standard, is within the discretionary exemption of the Act.

On the other hand, in Pennsylvania R. R. Co. v. United States, 124 F.Supp. 52, 64 (D.N.J.1954), the court found that the issuance of a governmental permit could in some situations be operational and not discretionary, where an officer's duty "was to issue the permits, provided only, that the normal qualifications were met by the applicant." There Coast Guard officials in Washington had authorized the use of a particular pier for the transfer of explosives in emergency situations. The "normal qualifications" referred to pertained to the existence of an emergency situation, which it was alleged one Coast Guard officer had negligently failed to determine.

3. 42 C.F.R. § 32(6) (c) (6) iii and 46 C.F.R. §§ 137.01–1, 05–15 authorize the Public Health Service examination but

do not state how the decision-making power is to be divided between the Public Health Service and the Coast Guard.

Keeping in mind these precedents on licensing, we now turn to the cases dealing with medical malpractice. Two lines of authority exist. A substantial number of cases have held psychiatric treatment or judgments to involve discretion and thus to be exempt from suit. In Smart v. United States, 207 F.2d 841 (10 Cir. 1953), plaintiff was injured by a man who, plaintiff alleged, had been negligently released from a government hospital. The court found the release discretionary, stating at 842–843:

> Whether such visits shall be permitted, when requested, of necessity involves the exercise of judgment and discretion. Before granting the request, it is necessary for the hospital authorities to consider the patient's case and determine whether in their judgment such a visit might be beneficial to him and whether authority therefor could be granted with safety to the public.

And in Blitz v. Boog, 328 F.2d 596, 599–600 (2 Cir. 1964), Judge, now Justice, Marshall stated of plaintiff's allegation that she had been negligently treated for psychiatric problems and not the "recurring fevers" she complained of:

> It requires little medical knowledge to realize that such ailments may sometimes have a psychosomatic origin, and that this possibility warrants investigation. We believe that the medical decision to give a patient a psychiatric examination in these circumstances, which is apparently all that appellant complains of, falls under the "discretionary function" exception of section 2680(a).

Similar rulings antedate Blitz v. Boog.[4]

On the other hand, various cases have entertained suits against the Government for the negligence of medical employees. In White v. United States, 317 F.2d 13, 17 (4 Cir. 1963), plaintiff's decedent, alleged to have been negligently released from a Veterans Administration hospital, later committed suicide. Judge Bell stated that:

> While the policy embodied in the Veterans Administration Regulations that patients should be allowed the maximum of freedom warranted by their condition is a discretionary decision, the application of that policy to an individual case is not within the category of policy decisions exempted by the statute. The application of that policy to the individual case is an administrative decision at the operational level which if negligently done will make the Government liable—whether it involves substandard professional conduct (malpractice) or simple negligence in custodial care.

The opinion then proceeded to distinguish on various grounds the cases cited above which granted exemption in malpractice cases.

Other cases have taken a similar view of the discretionary function in malpractice cases. The court in Friedland v. United States, 209 F.Supp. 684 (D. Mass.1962) reached the same conclusion as *White* on highly similar facts. In Fair v. United States, 234 F.2d 288 (5 Cir. 1956) a person formerly incarcerated in a government hospital killed plaintiff's decedent. The court concluded that Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), had significantly modified the views set forth in Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L. Ed. 1427 (1953) as to which acts are discretionary and which operational, and entertained the suit against hospital authorities for releasing the inmate. Other cases have asserted jurisdiction to hear claims concerning the improper administration of insulin treatment, Rufino v. United States, 126 F.Supp. 132 (SDNY 1954); the administration of an injurious drug instead of the prescribed spinal anaesthetic, Costley v. United

---

4. See Fahey v. United States, 153 F.Supp. 878, 879 (SDNY 1957); Dugan v. United States, 147 F.Supp. 674 (D.D.C.1956);

Kendrick v. United States, 82 F.Supp. 430 (N.D.Ala.1949).

States, 181 F.2d 723 (5 Cir. 1950); the erroneous injection of acid into a patient's ear, Dishman v. United States, 93 F.Supp. 567 (D.Md.1950); and the lack of observation of a mental patient with suicidal tendencies, United States v. Gray, 199 F.2d 239 (10 Cir. 1952).

No very clear rule emerges from either the licensing or the malpractice cases. It seems clear that where the grant of a license depends upon the balancing of several factors and the grant or refusal to grant is made without reliance upon any readily ascertainable rule or standard, the courts will hold the judgment to be discretionary. On the other hand, the *Pennsylvania Railroad* case, *supra*, seems correctly to indicate that where the grant involves nothing more than the matching of facts against a clear rule or standard, the grant will be considered operational and not discretionary. Thus a hypothetical statute requiring that an employment-certificate issue to all applicants of more than a given age, height, and weight would not empower an official to make a discretionary judgment under Section 2680(a).

It is of course much easier to state this broad distinction than to apply it to the particular facts of a case. For the most part courts seem to have done so by their own intuitive judgment as to the difficulty of the administrative medical decision involved. Doubtless this proclivity explains why courts have found jurisdiction where medical mistakes have been clear, such as the use of the wrong medicine, but have declined to assert jurisdiction in the murkier areas of psychiatry. However, a distinction based solely on the difficulty of a decision would seem to confuse the existence of discretion under the statute with the substantive question of whether due care was lacking and how demonstrably it was lacking on a particular set of facts. Such an approach to decisions causes illogical results, as, for example, that the maintenance of physical security is operational in the case of a clearly suicidal patient, United States v. Gray, *supra*, but discretionary in the case of a patient whose aggressive tendencies were much less apparent. Dugan v. United States, *supra*. Moreover, such an approach creates an exemption so broad that only in the most clear-cut instances of negligence can an injured person recover from the Government. To privilege from suit all governmental actions concerning which it conceivably might be demonstrated that there was a remote possibility that the officials arrived at correct judgments would be a severe limitation upon access to the courts in an age which has seen a steadily increasing impact by Government on the daily lives of its citizens.

We do not propose in place of this standard any "litmus paper test" as to whether discretion exists, Ove Gustavsson Contracting Co. v. Floete, 299 F.2d 655, 659 (2 Cir. 1962), cert. denied, 374 U.S. 827, 83 S.Ct. 1862, 10 L.Ed.2d 1050 (1963). However, we do find a number of factors relevant in reaching a proper decision. First, it is pertinent to inquire whether the complaint attacks on the one hand the nature of rules which a government agency has formulated, or on the other hand the way in which these rules are applied. It is clear that § 2680(a) was intended to protect the validity of governmental regulations from challenge in a tort action for damages, Dalehite v. United States, 346 U.S. 15, 27, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). The *Dalehite* Court stated, at 34, 73 S.Ct. at 967:

The "discretion" protected by the section is not that of the judge—a power to decide within the limits of positive rules of law subject to judicial review. It is the discretion of the executive or the administrator to act according to one's judgment of the best course, a concept of substantial historical ancestry in American law. (Footnote omitted.)

And at 35–36, 73 S.Ct. at 968:

\* \* \* the "discretionary function or duty" that cannot form a basis for suit under the Tort Claims Act in-

cludes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications, or schedules of operations. (Footnote omitted.)

This language appears to privilege from suit those decisions which either establish a rule for future governmental behavior or constitute an *ad hoc* determination which neither applies an existing rule nor establishes one for future cases. By contrast *Dalehite* seems to subject to suit those decisions which apply an existing rule to the facts of a case. To be sure, the application of existing rules in new contexts sometimes involves policy decisions by administrative officials akin to those made by legislators. Nevertheless, it can usually be determined whether the governing statute or regulation contemplates that an official will make new rules or *ad hoc* decisions on the one hand or apply old understood rules on the other. Whether the person whose judgment is attacked occupies a high or low level governmental position may be relevant in reaching a conclusion. Too, depending on whether it emphasizes the discretion of the decision-making officer or agency as did the regulation attacked in Dupree v. United States, *supra*, the language of the statute or regulation may guide the determination.

■ Another way to ask these same questions may be to inquire whether state law standards can adequately evaluate the course of action contemplated by a federal statute or regulation. This is not to imply that state tort standards, designed to remedy private wrongs, cannot apply to uniquely governmental decisions. See Indian Towing Co. v. United States, *supra*. However, state tort standards cannot adequately control those governmental decisions in which, to be effective, the decision-maker must look to considerations of public policy and not merely to established professional standards or to standards of general reasonableness. Of course the courts may inquire into whether an engineer's judgment in applying the rules of his craft was reasonable, but if the engineer is a government official who must, apart from questions of engineering efficiency and safety, determine whether a particular program of production is a desirable program, the courts cannot doubt the reasonableness of his evaluation of the public interest.

Here it seems clear that Hendry complains of the way in which the Coast Guard and the Public Health Service applied medical principles to his case, not of the content of the principles which they adopted as relevant. Nor did the doctors who conducted the examination of Hendry have policy-making rank in their organizations. Finally, the statute and regulations governing the delicensing procedure do not appear to convey discretion to identify and consider public safety goals. The only discretion apparently contemplated is that inherent in the judgments of any medical doctor in private practice.

■ Finally, complaints attacking discretionary decisions may frequently raise questions which are political and nonjusticiable in nature, but here the judgments arrived at by the doctors are not different in kind or complexity from those which courts are accustomed to entertain when tort suits are bought against private physicians. The fact that judgments of government officials occur in areas requiring professional expert evaluation does not necessarily remove those judgments from the examination of courts by classifying them as discretionary functions under the Act. To the extent that the medical profession establishes no set rules to accommodate the handling of a particular medical case, the individual doctor's judgment in that case should be measured by the standards of due care.

■ For all these reasons we conclude that the court has jurisdiction to entertain appellant's claim that he suffered damages as a result of the negligence of the doctors. Therefore an ex-

amination of the merits of this allegation is necessary.

The standard of review to be applied to a district court's finding of negligence is not the "clearly erroneous" standard the Government advances, for a finding of negligence is reviewable as a matter of law. Nevertheless, the lower court finding "[will] ordinarily stand unless the [lower] court manifests an incorrect conception of the applicable law." Cleary v. United States Lines Co., 411 F.2d 1009 (2 Cir. June 2, 1969), citing Radovich v. Cunard Steamship Co., 364 F.2d 149, 152 (2 Cir. 1966) and Esso Standard Oil S.A. v. S.S. Gasbras Sul., 387 F.2d 573 (2 Cir.), cert. denied, 391 U.S. 914, 88 S.Ct. 1808, 20 L.Ed.2d 653 (1968).

In the present case, there are no grounds for disturbing Judge Pollack's findings of fact or challenging his conception of the applicable law. As observed above, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Thus New York law applies. United States v. Muniz, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963). As correctly stated by the court below, the New York malpractice law requires that a physician use his "best judgment." This does not mean he can be held liable for a mere error in judgment; it only means that he is liable if he does not do what he thinks is best to do after he has made a careful examination. Cunningham v. State, 10 A.D.2d 751, 197 N.Y.S.2d 542 (3d Dep't 1960), aff'd, 11 N.Y.2d 808, 227 N.Y.S.2d 253, 181 N.E.2d 852 (1962).

Although the trial record is not entirely clear it would appear that at most appellant charges four specific ways in which examinations by Doctors Ramirez and Feuerburgh were not "careful." The first claim is that Dr. Ramirez was practicing medicine in violation of the New York Education Law McKinney's Consol.Laws, c. 16, § 6512, which requires physicians to be licensed by the State in order to practice medicine. Appellant notes that there is an exception to this rule for graduates of foreign medical schools who are certified by the Education Council for Foreign Medical Graduates and who are commissioned officers in the uniformed services. Dr. Ramirez was a Cuban who had practiced neurology and psychiatry in Havana for nineteen years before he came to the Public Health Service Hospital, and he did have the proper certification. Appellant, nevertheless, claims that even if Dr. Ramirez could qualify under this exception the statute was violated because it also requires the supervision of qualifying doctors and the supervising post of Chief of Psychiatric Services at the Public Health Service Hospital was vacant in April 1962.

This first argument of appellant is patently legalistic and may be quickly dismissed. The court below appeared to rely on the slight evidence in the record that there was an Acting Chief to supervise Dr. Ramirez. Also, the test of the New York Education Law seems to negate an intention to make it applicable to physicians practicing in federal hospitals—assuming that New York could constitutionally do so. However, we need not rely on either of these grounds because under New York law it is not malpractice per se to practice medicine without a license. An unlicensed physician is liable for malpractice and negligence only if he did not exercise the care and skill that would have been exercised by a qualified licensed practitioner. Brown v. Shyne, 242 N.Y. 176, 151 N.E. 197, 44 A.L.R. 1407 (1926). Judge Pollack found, and we agree, that Dr. Ramirez did exercise the proper standard of care and therefore it is immaterial whether he was properly licensed.

The other three alleged grounds of malpractice are also unavailing. According to the appellant, Dr. Ramirez was negligent in relying solely on Dr. Feuerburgh's report that appellant was a "paranoid schizophrenic" and in not

conducting a second examination of the appellant after receiving that report. The trial testimony showed, however, that Dr. Ramirez possessed a substantial body of information upon which to base his conclusion that Hendry was "unfit for duty" at that time for, in addition to Dr. Feuerburgh's report, Dr. Ramirez had made his own examination report which indicated his personal doubts of the appellant's normality, there was the Coast Guard report containing the statements of Hendry's fellow crew members, and there were several handwritten letters sent by Hendry to the Coast Guard which indicated that the author believed he was being persecuted. All of these, according to testimony, played a part in Dr. Ramirez's thinking. In such circumstances, the court below could well find that Dr. Ramirez's conclusion was arrived at with due care and that a second examination was not required even though appellant's expert psychiatrist testified that in similar circumstances he would have made a second one.

 The appellant contended that Dr. Feuerburgh's report was negligently prepared in that he misinterpreted the psychological test results and also took into account factors other than the patient's responses to the test questions. The appellant's own expert testified, however, that while he disagreed with Dr. Feuerburgh's conclusions, a trained psychologist like Dr. Feuerburgh was probably better qualified to interpret such tests than a psychiatrist. In addition, the witness characterized Dr. Feuerburgh's interpretation as an honest one though he stated that another psychologist might have reached a different interpretation. Finally, there was no testimony that a psychologist must confine himself to test responses alone without the aid of background information such as the information contained in the Coast Guard report which Dr. Feuerburgh had seen. The appellant's final contention appears to be that the examination itself, apart from the decision based on it, caused his mental anguish. He objects to the use of the phrase "paranoid schizophrenic" in the doctors' reports. The discretionary exception seems wholly inapplicable on its face to this particularized objection to the actual treatment he received. See, e. g., Rufino v. United States, supra; Costley v. United States, supra; Dishman v. United States, supra. He claims the inclusion of this phrase negligently branded him as a psychotic and caused him to suffer humiliation and shock. However, Dr. Smith, the Chief of the Psychiatric Service, testified that the phrase "paranoid schizophrenic" should not be interpreted out of context and that it could indicate that a person was not psychotic but only that he had a personality disorder. It was the opinion of Dr. Smith that the appellant did suffer from such a personality disorder even though he believed it should not have disqualified him for sea duty. Thus, there is no evidence that the phrase in question when applied to appellant was negligently applied to him. Indeed, if he had not sought out the confidential medical reports he would never have seen the phrase that he alleges humiliated him and caused him distress.

There being no basis for finding any negligence on the part of the government doctors in this case, we affirm the district court.