**FAMOUS KNITWEAR CORPORA-TION, Appellee,**

v.

**DRUG FAIR, INC., Appellant.**

**FAMOUS KNITWEAR CORPORA-TION, Appellant,**

v.

**DRUG FAIR, INC., Appellee.**

Nos. 73-1260, 73-1261.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 7, 1974.

Decided March 14, 1974.

Henry St. J. Fitzgerald, Arlington, Va. (Peter K. Stackhouse and Tolbert, Lewis & Fitzgerald, Ltd., Arlington, Va., on brief), for appellant in No. 73–1260 and for appellee in No. 73–1261.

Nathan Lewin (William H. Jeffress, Jr., Miller, Cassidy, Larroca & Lewin, Washington, D. C., J. Strouse Campbell and Herrell, Campbell & Lawson, Arlington, Va., on brief), for appellee in No. 73–1260 and for appellant in No. 73–1261.

Before HAYNSWORTH, Chief Judge, and CRAVEN and FIELD, Circuit Judges.

CRAVEN, Circuit Judge:

In the course of urging reversal of the judgment below, appellant Drug Fair insists that the district judge's decision is "freely reviewable," *i. e.,* that we need only disagree and need not be convinced that the decision is "clearly erroneous" in order to reverse. More succinctly, Drug Fair insists that the "findings" below are without the protection of Fed.R.Civ.P. 52(a). We disagree and affirm.

## I

The central issue is whether it was reasonable for Aaron Feder, Famous Knitwear's agent, to rely upon the manifestations of apparent authority made by Drug Fair as to Bert Arthur, its buyer. The district judge concluded that, based on the appointment of Arthur to a position in which his predecessor had apparent authority to enter binding contracts and the authority, generally, of buyers in the trade to make binding commitments on behalf of their principals, Drug Fair had clothed Arthur with apparent authority to enter into the contract in question. The district judge further found that the size of the transaction was not, of itself, so unusual as to lead a reasonable man to question the scope of that apparent authority. The finding of apparent authority, including, as it must, the reasonableness of Feder's reliance on Drug Fair's manifestations in that regard, is an "ultimate factual inference" and is to be reviewed under the "clearly erroneous" standard[1] of Rule 52(a) unless such inference is made "in disregard of the applicable principles of law" or through "gross overemphasis on one relevant principle to the exclusion of others." Piedmont Minerals Co. v. United States, 429 F.2d 560, 562 (4th Cir. 1970); Jewell Ridge Coal Corp. v. C. I. R., 318 F.2d 695 (4th Cir. 1963). The district court's inference of apparent authority was not "induced by an erroneous view of the law," Bogue Elec. Mfg. Co. v. Coconut

---

1. Though Learned Hand once wrote that "it is idle to try to define" what is meant by the words "clearly erroneous" in Rule 52(a), United States v. Aluminum Co. of America, 148 F.2d 416, 433 (1945), the definitive test seems to be:

A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.
United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L. Ed. 746 (1948).

Grove Bank, 269 F.2d 1, 4 (5th Cir. 1959), nor are the underlying findings of fact upon which that inference was made clearly erroneous within the meaning of Rule 52(a).

We are not unaware of language contained in Hicks v. United States, 368 F. 2d 626 (4th Cir. 1966), to the effect that a judge's finding of negligence is a conclusion of law and is reviewable on appeal free of the protection of Rule 52 (a).[2] The fact that negligence, a so-called "mixed question of law and fact," has been treated as freely reviewable does not mean that all questions which can be so characterized are free of the "clearly erroneous" stricture. *See* C. Wright & A. Miller, Federal Practice and Procedure: Civil §§ 2589–90. We believe that the creation, duration, and

scope of an agency relationship and, specifically, the question of the reasonableness of a third party's reliance on a principal's manifestations of the apparent authority of his agent are essentially questions of fact. Bogue Elec. Mfg. Co. v. Coconut Grove Bank, 269 F.2d 1 (5th Cir. 1959); Steinbrugge v. Haddock, 281 F.2d 871 (10th Cir. 1960). As such, the clearly erroneous standard is applicable.

## II

■ Without explanation the district court adopted the lost profits measure of damages set out in section 2–708(2) of the Uniform Commercial Code.[3] Whether this was proper or whether the more usual[4] contract-market formula of section 2–708(1) should have been applied

---

**2.** Although we presently have no occasion to review the correctness of the *Hicks* decision, we note that seven circuits have taken positions contrary to that decision and have held the clearly erroneous standard applicable to the finding or conclusion of negligence. Socash v. Addison Crane Co., 120 U.S.App.D.C. 308, 346 F.2d 420 (1965); Obolensky v. Saldana Schmier, 409 F.2d 52 (1st Cir. 1969); Nelson v. Jacksonville Shipyards, Inc., 440 F.2d 668 (5th Cir. 1971); J. A. Jones Const. Co. v. Englert Eng. Co., 438 F.2d 3 (6th Cir. 1971); Leatherman v. Gateway Transportation Co., 331 F.2d 241 (7th Cir. 1964); Sterling Drug, Inc. v. Yarrow, 408 F.2d 978 (8th Cir. 1969); Sines v. United States, 430 F.2d 644 (9th Cir. 1970); United States v. Sommers, 351 F.2d 354 (10th Cir. 1965). Even the Second Circuit seems to have retreated from Mamiye Bros. v. Barber S. S. Lines, Inc., 360 F.2d 774 (2 Cir., 1966), a case which most clearly stated the minority point of view and upon which the *Hicks* case relied. In Hendry v. United States, 418 F.2d 774 (1969), Judge Waterman wrote:

The standard of review to be applied to a district court's finding of negligence is not the "clearly erroneous" standard the Government advances, for a finding of negligence is reviewable as a matter of law. Nevertheless, the lower court finding "[will] ordinarily stand unless the [lower] court manifests an incorrect conception of the applicable law."

418 F.2d at 784 (citations omitted).

As recently as 1972 we had occasion to note the trend of the majority. In Tucker v. Calmar S. S. Corp., 4 Cir., 457 F.2d 440, we said:

A district court's findings regarding unseaworthiness and negligence are generally treated as findings of fact reviewable under the "clearly erroneous" standard of F.R.C.P. Rule 52(a).

457 F.2d at 444.

**3.** Section 2–708 (2A Va.Code § 8.2–708) reads as follows:

§ 2–708. *Seller's damages for non-acceptance or repudiation.—*

(1) Subject to subsection (2) and to the provisions of this title with respect to proof of market price (§ 8.2–723), the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the, time and place for tender and the unpaid contract price together with any incidental damages provided in this title (§ 8.2–710), but less expenses saved in consequence of the buyer's breach.

(2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this title (§ 8.2–710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

**4.** Section 2–708(2) applies only "[i]f the measure of damages provided in subsection (1) is inadequate to put the seller in as

depends upon whether section 2–708(2) was intended to apply to the so-called "lost volume" seller [5] and whether Famous Knitwear was, in fact, a "lost volume" seller. We are persuaded both by the statutory history [6] of section 2–708 and by Official Comment 2 that the lost profits measure of damages outlined in section 2–708(2) was meant to apply to the "lost volume" situation. As the Comment states:

> This section permits the recovery of lost profits in *all appropriate* cases, which would include all standard priced goods. The normal measure there would be list price less cost to the dealer or list price less manufacturing cost to the manufacturer [Emphasis added.]

It may well be that Famous Knitwear, a "middleman" between manufacturer and retailer (Drug Fair), was a lost volume seller, as was the retailer in Neri v. Retail Marine Corp., 30 N.Y.2d 393, 334 N.Y.S.2d 165, 285 N.E.2d 311 (1972). If so, the view of the Court of Appeals of New York in *Neri* that "the last sentence of subsection (2) [of section 2–708

. . . referring to 'due credit for payments or proceeds of resale' is inapplicable to this retail sales contract,'"[7] 334 N.Y.S.2d at 169, 285 N.E.2d at 314, is probably the proper approach in this case as well. Were this not the case, then the measure of damages would be substantially the same as the contract-market differential of 2–708(1), and 2–708(2) would have meaning only for seller-manufacturers and not for other sellers of "standard priced goods." The Official Comment negates any such purpose on the part of the drafters.

■ We are still left with the question of whether Famous Knitwear is a lost volume seller and, hence, a seller for whom "the measure of damages provided in subsection (1) is inadequate." Due to the seasonal nature of the goods involved (sweaters) and the long lead-time necessary for Famous Knitwear to secure goods from its suppliers, Drug Fair alleges that, but for its placement of such a large order with Famous Knitwear, the seller would not have had the necessary goods in stock to sell to other buyers subsequent to Drug Fair's

good a position as performance would have done . . . ."

5. The term is that of Professor Harris. *See* Harris, A Radical Restatement of the Law of Seller's Damages: Sales Act and Commercial Code Results Compared, 18 Stan.L. Rev. 66 (1964) [hereinafter cited as Harris]. Its meaning is illustrated by Professors White and Summers as follows:
> [A]ssume a contract for the sale of a washing machine with a list price of $500. Buyer breaches, and seller resells that washing machine at the same list price that buyer had been willing to pay. However, the resale buyer is one of seller's regular customers who had intended to purchase a washing machine from him anyway. If the seller's total cost per machine was $300, he stood to gain an aggregate profit of $400, that is, $200 profit from each of two sales. Clearly the 2–708 contract-market differential formula is inadequate in this situation since it gives no damages to the seller who has lost a $200 profit because of the breach. In such a case the damage award should be the lost profit, that is, $200, for this will place the seller "in as good a position as performance would have done."

J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code, § 7–9, at 226–27 (1972) [hereinafter cited as White & Summers]. *See also* Hawkland, Sales and Bulk Sales, 153–54 (1958).

6. *See* Harris, 97–99; White & Summers at 226 n. 48–49.

7. In a footnote the New York court elaborated:
> The concluding clause, "due credit for payments or proceeds of resale," is intended to refer to "the privilege of the seller to realize junk value when it is manifestly useless to complete the operation of manufacture." (Supp. No. 1 to the 1952 Official Draft of Text and Comments of the Uniform Commercial Code, as Amended by the Action of the American Law Institute of the National Conference of Commissioners on Uniform Laws [1954], p. 14). 334 N.Y.S.2d at 314, 285 N.E.2d at 314. The meaning of 2–708(2), and especially the concluding clause, thus varies according to the type of seller involved. In the context of "components" sellers, the clause can be given effect, *see* White & Summers at 227–28, but not so in the lost volume seller context.

breach. Famous Knitwear, on the other hand, contends that it could have fulfilled its contract with Drug Fair and procured additional goods for sale to the later buyers. Because there are no findings of fact by the district judge as to the conflicting assertions, we are unable to determine if Famous Knitwear is a lost volume seller and, as such, entitled to lost profits under 2–708(2). We, therefore vacate the amount of the judgment and remand for further proceedings. On remand, the district court may make supplemental findings or, in its discretion, reopen the trial on the question of damages.

### III

In Famous Knitwear's cross-appeal we are asked to review the district court's finding that Drug Fair's order of two lines of sweaters was unconditionally cancelled and that Famous Knitwear was, therefore, not entitled to damages as to those lines. We think these findings were clearly erroneous, and reverse.

Concerned about the failure of Drug Fair to supply a written confirmation, including shipment instructions, for Arthur's February 24 oral commitment, Aaron Feder, Famous Knitwear's agent, paid a visit to Drug Fair's corporate headquarters in Alexandria, Virginia, in June of 1970. Feder met with Arthur and expressed his concern. On condition that the entire fall order (except for two lines of sweaters) remain intact, and in exchange for Arthur's assurance to that effect, Feder agreed to accept cancellation of that part of the February 24 order which dealt with spring goods and for which the delivery date had already passed without shipment instructions from Drug Fair. Since Drug Fair later refused to honor Arthur's commitment, the condition failed and Famous-Knitwear correctly was awarded damages for Drug Fair's refusal to accept the spring goods.

At this same June meeting, Feder and Arthur also agreed to cancel two lines of sweaters which were part of the fall goods ordered on February 24. Drug Fair contends that this cancellation was unconditional, though admittedly arising from the same negotiations that led to the conditional cancellations of spring goods. In his opinion from the bench the district judge agreed:

I do think, however, that the Defendant is entitled to the credits for 5R and 1950R because it is my recollection of Mr. Aaron Feder's testimony in court, not just his deposition, that he said that he could have cancelled those, and I don't think it was the cancellation of any fall orders that was contingent on their performing their contract.

The district judge correctly recollected that Aaron Feder, on cross-examination, admitted that the two sweater lines had been cancelled.[8] But only on redirect examination was Feder questioned as to the relationship between the agreement

---

8. Q. Look on your fall order.
A. Yes, sir.
Q. Can you find Item 5–R?
A. Yes, sir.
Q. Does that have a line through it?
A. Yes, sir.
Q. Was that canceled?
A. I don't know. It might have been.
Q. Do you recall agreeing to accept a cancellation on that?
A. I might have agreed to cancel all that.
Q. Do you recall me asking you about this in your deposition in my office, on Page 59, when I said, "What does the line through the 4th line mean?" when we were looking at that page?
A. I don't recall offhand, no.
Q. Do you recall answering this, "Yes. I remember this. This number was also one of the numbers that we had agreed to cancel.
A. "Do you recall the reason?
"I don't recall offhand, no.
"Read what it was.
"5–R, 550 dozen, $16.50."
Does that refresh your recollection?
A. Yes, sir. That is correct. There is also another number now, as I recall, and that was number 1950–R, I think it was. Now, I do recall that, yes.

to cancel the spring goods and the agreement to cancel the two fall sweater lines. It is apparent from Feder's testimony on redirect that *both* agreements were conditioned on Drug Fair's acceptance of the remainder of the February 24 order.[9] The district judge's opinion does not reveal that he disbelieved Feder's redirect testimony, but that he remembered only the content of Feder's testimony on cross-examination. Lacking any contradictory testimony on the part of Bert Arthur, who was Drug Fair's agent at the meeting in question and who testified for Drug Fair at the trial, we believe that Feder's testimony, taken as a whole, establishes a conditional cancellation as to both spring goods and the two fall sweater lines and that the district judge's contrary conclusion is clearly erroneous. As to Famous Knitwear's cross-appeal, the judgment is reversed, and the case is remanded to the district court to determine the proper measure of damages as discussed in Part II above.

Affirmed in part, reversed in part, and remanded.

---

9. Now, there has been some discussion on direct [sic] examination on cancellations that you agreed to with Mr. Arthur in June of 1970, with regard to taking a cancellation of the spring order. Was that conditional in any way?
   A. You mean, the accepting of a cancellation on the spring order?
   Q. Yes.
   A. Yes, sir, it was.
   Q. And what were the conditions?
   THE COURT: He has testified on this, Mr. Lewin.

Q. How about the cancellations—Mr. Fitzgerald asked you about the cancellation of items 5–R and I think 1950–R, which were crossed out in the fall order; was that similarly conditional?
A. Yes, sir.
Q. On the acceptance of the entire fall order?
A. Yes, sir, all other items that were on there.