Anne DeMARTINO and Mario
DeMartino, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

No. 79 CV 2392 (ERN).

United States District Court,
E.D. New York.

March 7, 1983.

George Rockman, North Babylon, N.Y., for plaintiffs.

Raymond J. Dearie, U.S. Atty., E.D.N.Y., for defendant by Beryl R. Jones, Asst. U.S. Atty., Brooklyn, N.Y.

## MEMORANDUM OF DECISION AND ORDER

NEAHER, District Judge.

This action was brought under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., to recover damages for personal injuries claimed to have been sustained by plaintiff Anne DeMartino[1] in an automobile accident involving a government employee. The action having been tried upon the facts without a jury, the facts and discussion which follow constitute the Court's findings of fact and conclusions of law. Rule 52(a), F.R.Civ.P.

---

1. Plaintiff's husband was dismissed as a co-plaintiff because of failure to comply with the administrative filing requirement before bringing action.

The parties do not dispute that there was contact between two vehicles at an intersection in the Borough of Queens at approximately 11 a.m. on November 30, 1977. Plaintiff was a passenger in one of them, a Cadillac sedan owned and operated by Rose Savarese, plaintiff's aunt. The other vehicle was a Plymouth sedan owned by the Federal Bureau of Investigation (FBI) and operated by Walter Scheuplein, a Special Agent of the FBI. Both vehicles were in the left westbound lane of Northern Boulevard and had stopped for a red light at the intersection of 150th Street. The Savarese vehicle was directly in front of the FBI vehicle. Traffic conditions were medium to heavy and it had rained on and off that day.

The testimony of the respective drivers was basically in agreement as to the manner in which the two vehicles came into contact but not as to which moved first. According to Scheuplein the Savarese vehicle, which was the first car at the intersection, began to move forward. In reaction to that Scheuplein, who said he was about 10 to 20 feet behind, also began to move forward but had to stop within a few feet when the Savarese vehicle suddenly stopped. The vehicles collided, he testified, because he could not stop quickly enough. Tr. 248. He had no recollection as to whether the traffic light had changed from red to any other color. Tr. 263.

Rose Savarese testified that she was still stopped for the red light when "[t]he fellow behind me thought the light had changed and he started to roll and he just tapped me." Tr. 456. She got out of her car "to see if I had any damage . . . and didn't see any," and so informed Scheuplein when he requested that they pull over to the side and wait for a police officer he had called to the scene. Tr. 456–58. She saw only "a slight indentation in the bumper . . . about four inches" long and only "very slight" in depth. Tr. 458.[2] She testified further that at the time of the impact her car did not move, nor did her body or that of plaintiff,

and they were not wearing seatbelts. Tr. 457. She made no claim for any injury to her person or the car.

Joseph Cannon, the police officer who came to the scene, testified he had no independent recollection of the occurrence but identified a Police Accident Report, PX 1, which he said it was his standard practice to complete after speaking to both drivers and anyone else involved. His brief description of the accident tends to corroborate Scheuplein's testimony that the Savarese vehicle had already started moving forward when the collision occurred and was not stopped as Mrs. Savarese and plaintiff testified. Tr. 456, 65. Cannon's report states:

"Veh # [1] *starting* in traffic going west on Northern Blvd struck by Veh 2 also west. Veh # 2 skidded on wet roadway." PX 1, emphasis supplied.

Cannon's responses to coded questions in the report created further discrepancies vis-a-vis the testimony of plaintiff and Mrs. Savarese. These responses reflect that both had worn "lap belts" contrary to their denials at trial, Tr. 29, 457, and that both had "complaints of pain" in the "Back" but "RMA," *i.e.*, refused medical attention. PX 1. At trial, Mrs. Savarese testified she told the police officer that she had not been hurt, and he then asked plaintiff, who replied that "her back was bothering her." Tr. 460. In her own direct testimony, plaintiff said that the officer asked only, "how I was feeling, if I wanted to go to the hospital, and that was it." Tr. 35. However, in response to a similar inquiry from Scheuplein, she told him "my back had bothered me and I had hit my head . . . on the windshield." Tr. 32.

Plaintiff's further testimony does little to clear up the discrepancies noted. According to her, the Savarese vehicle was "pushed" into the intersection, Tr. 30, contrary to Mrs. Savarese's testimony that the FBI vehicle merely "tapped" her car, inflicting a bumper dent so minor as to warrant no claim for damage or repair, and that her car did not move as a result of the impact.

**2.** Scheuplein's description of the damage was similar: it was "a vertical dent" in the bumper perhaps five or six inches long and a half-inch in depth. Tr. 250–51.

Moreover, the FBI vehicle was not damaged at all. Tr. 254–55.

Nonetheless, however slight the impact, if it was the proximate cause of injury to the plaintiff, or exacerbated a pre-existing injury or condition from which plaintiff suffered, the government would be liable if Agent Scheuplein was negligent in the operation of the FBI vehicle under existing road conditions and his negligence was the proximate cause of plaintiff's injuries.

Section 1129 of the New York Motor Vehicle and Traffic Law, which is applicable in the City of New York,[3] provides that

"(a) The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway."

■■■ The effect of the statute is to require that a motorist drive his car at a sufficient distance to the rear of the car ahead so as to be able to stop in the clear space between the cars in case the preceding automobile is stopped with due care. Thus, whether the Savarese vehicle was stopped or had started to move forward, it was incumbent upon Agent Scheuplein to control his vehicle so as to avoid a collision with the vehicle ahead. The violation of a statute enacted to secure the safety of persons using a public highway is at least evidence of negligence. *Basso v. Miller*, 40 N.Y.2d 233, 243, 386 N.Y.S.2d 564, 569, 352 N.E.2d 868, 873 (1975); *Gonzalez v. Medina*, 69 A.D.2d 14, 417 N.Y.S.2d 953, 955 (1st Dep't 1979).

■■■ I find that plaintiff has sustained her burden of proving by a fair preponderance of the evidence that Agent Scheuplein was negligent in failing to observe any change in the traffic signal, in failing to take account of the wet pavement condition of the highway, as noted in Officer Cannon's report, and in failing to control his vehicle so as to avoid contact with the Savarese vehicle ahead.

The critical question is whether such negligence was the proximate cause of plaintiff's claimed injury. Her sole claim is that the accident of November 30, 1977 caused an injury to her lower back, a condition she never previously had, from which she continues to suffer. Hence there is no claim of exacerbation of a pre-existing back injury. The government contends that sharp issues as to plaintiff's credibility are involved in the proximate cause issue.

Plaintiff's claim of low back injury caused by this accident rests solely upon her own testimony that the impact of the FBI Plymouth on the Savarese Cadillac was of such force as to propel her violently *forward* against the windshield, then backward and then forward again, breaking her eyeglass frames, following which she "had pain in my lower back, my neck." Tr. 29. Aside from the agreement of both drivers that the Savarese car did not move at all, well-known physical laws are in conflict with plaintiff's version. A rear end collision which propels the struck vehicle sharply forward causes a passenger to be thrown *backward,* not forward, with the well-known "whiplash" effect. A passenger is thrown forward only when a vehicle's forward motion is abruptly halted as by a sudden brake stop. The physical facts simply do not support her version of the cause of her injury.

Aside from that, the preponderance of the evidence is clearly not in plaintiff's favor on the issue of the proximate cause of her low back injury. The testimony of Agent Scheuplein and Mrs. Savarese, who were in agreement that the impact was slight and did not cause the Cadillac to move, outweighs the clearly interested testimony of plaintiff. The testimony of Mrs. Savarese that neither she nor plaintiff, whose weight was at least 220 pounds, were displaced from their seats by the impact cannot be rejected on the suggestion that they no longer enjoy a friendly relationship. The Court's own notes of the demeanor of Mrs. Savarese reflect that she was an alert

---

**3.** Section 1129 is one of the provisions of State law which is not superseded pursuant to the New York City Charter, ch. 40. See New York City Traffic Regulations, Art. 17, § 190.

and intelligent witness. I find that her testimony that the Cadillac did not move when struck by the FBI car, and that neither she nor plaintiff was thrown forward, is the more credible version of the occurrence.

That plaintiff was a passenger and not in control of the Savarese vehicle does not relieve her of the burden of establishing by a fair preponderance of the evidence that her claimed back injury was in fact the result of Agent Scheuplein's negligence. The law of New York which is applicable here, *Hendry v. United States,* 280 F.Supp. 27, 33 (S.D.N.Y.1968), *aff'd,* 418 F.2d 774 (2d Cir.1969), is well settled that "in actions of negligence damage is of the very gist and essence of the plaintiff's cause." *Schmidt v. Merchants Despatch Trans. Co.,* 270 N.Y. 287, 300, 200 N.E. 824 (1936). In short, negligence without damage gives rise to no claim.

The government does not deny that plaintiff has a back problem which is causing her pain but contends that plaintiff had the problem before this accident. Mrs. Savarese testified that plaintiff complained about her back bothering her when she picked plaintiff up for the trip to Jackson Heights. Tr. 455. Plaintiff denied that she suffered from back pain before this accident occurred and testified that she performed a full range of strenuous housekeeping tasks. Tr. 41. Although her pain was excruciating, she did not see a doctor for at least three weeks, explaining that he was away on vacation. She admitted that this doctor, Dr. Sciales, had been treating her for weight problems for a long time prior to the accident and that she had submitted to Allstate, the no-fault insurer, medical and prescription bills for which she was reimbursed. These covered the period from November 30, 1977—the date of the accident—to a last payment on March 24, 1982, Tr. 138, and included medication for her thyroid problem and weight loss unrelated to the injury claimed. Tr. 99–100.

On cross-examination plaintiff admitted that her husband filed a report of a motor vehicle accident on January 12, 1976, which stated that on December 17, 1975, plaintiff had been injured in their car when her husband made a quick stop to avoid hitting another car. DX L. The report further stated that plaintiff had been thrown forward, hitting the dashboard and breaking her eyeglasses, bruising her right knee and sustaining injuries to her leg and back. DX L, U. Following that accident, plaintiff submitted drug bills to Allstate which were clearly unrelated to the injuries claimed. DX D, E. She also claimed she was totally disabled, a claim rejected by Dr. A. Burton White after he examined her on October 9, 1976. DX V.

The medical testimony and reports are essentially ambivalent and provide no satisfactory basis for a finding that plaintiff's back problem derived from the accident of November 30, 1977. She places heavy reliance on the results of a lumbar myelogram performed July 3, 1978. PX 5. That examination, however, revealed generalized defects of the lumbar spine, right and left. *Id.* On January 31, 1979, Dr. A. Burton White examined films of the myelogram and reported that it was "not conclusive for any disc defect." PX 4. In his opinion, these appeared "to be anatomic to the individual" and their bilateral appearance "would exclude this from being a traumatic herniated disc." *Id.*

In addition, in view of plaintiff's claim of right leg pain (lumbosacral radiculopathy), an electrodiagnostic study was performed on February 21, 1980 at the request of Dr. Michael Erroco, an orthopedic surgeon, who was called by plaintiff. The performing doctor reported that the study was "normal" with "no evidence of peripheral neuropathy or . . . dysfunction in the muscles innervated [sic] by the lumbosacral nerve roots on the right side." DX P. Dr. Erroco conceded that his final impression of plaintiff's back condition was "degenerative disc," not herniated, and he did not reach that conclusion with "a reasonable degree of medical certainty." Tr. 227. He was "sure" that plaintiff had radiculitis of the S–1 nerve. *Id.* In response to the Court's question, he could not tell whether the ven-

tral bulging revealed in the myelogram was consistent with trauma or simply aging. Tr. 229–30.

Plaintiff's other witness was Dr. Anthony D. Valente, a doctor of chiropracty, who first saw plaintiff on May 24, 1980. Tr. 173. His examination revealed marked restriction of the cervical and lumbar spine ranges of motion, with pain "elicited" on palpation of the lower lumbar spine, which traveled to the right calf and foot. In his opinion plaintiff had "a lower lumbar intervertebral disc syndrome, with a secondary right sciatic neuritis," as well as "a cervical post-sciatic radiculitis." Tr. 181. Also, after viewing the Flushing Hospital x-rays and myelogram x-rays his conclusion was that plaintiff had an "intervertebral lumbar disc herniation." Tr. 190. He admitted, however, that the final diagnosis shown on the Flushing Hospital record was "lumbosacral spondylosis" (misspelled at Tr. 207 as "spondeolothesus"). Dorland's Medical Dictionary, 24th Ed., defines "spondylosis" as "Ankylosis of a vertebral joint." *Id.* at 1426. "Ankylosis" is defined as "Abnormal immobility and consolidation of a joint." *Id.* at 97.

The government called Dr. Marvin L. Shelton, a specialist in orthopedic surgery, who teaches clinical orthopedic surgery at the Medical School of Columbia University and is an attending orthopedic surgeon at the Presbyterian Medical Center. Tr. 307–08. He examined plaintiff on August 21, 1980 and reviewed the medical reports of Drs. Sciales, Liggett, Pearlman, Karlin, Belenque, Erroco, Finkelstein, White, Frank, and Bornstein, and also the Flushing Hospital records including the x-ray myelogram and EMG report from North Shore Hospital. Tr. 310–11. Dr. Shelton testified that the myelogram x-rays revealed defects in plaintiff's lumbar spine at each intervertebral level. In his opinion the narrowing of the intervertebral spaces, bulging discs and arthritic spurring reflected a degenerative condition of long standing and not disc herniation produced by trauma as in an automobile accident. Tr. 319–24. It was also his opinion that the roots of plaintiff's sciatic nerve were not involved in her condition in view of the absence of any muscle atro-

phy and the normal EMG examination, and that her excessive weight of 220 pounds led to and aggravated the degenerative condition he observed. Tr. 336–27. He noted further that the Flushing Hospital final discharge diagnosis of "LS spondylosis" is indicative of degenerative disc disease throughout the lumbar spine and thus consistent with his findings.

In light of Dr. Erroco's admission that plaintiff "has a degenerative disc" and degenerative changes at other levels of the lumbar and sacral spine, and that he could not say whether the condition was consistent with trauma or aging, Tr. 227–30, Dr. Shelton's opinion is actually supported by plaintiff's principal medical expert as well as the opinion of Dr. A. Burton White, *supra* p. 10. In that state of the medical testimony, plaintiff has failed to carry her burden of showing by a preponderance of the evidence that her back condition was proximately caused by Agent Scheuplein's negligence.

Accordingly, the defendant is entitled to judgment dismissing the complaint with costs as provided by law.

SO ORDERED.

The Clerk is directed to forward copies of this Memorandum of Decision and Order to counsel for the parties.